**WEST TELEMARKETING CORPORATION OUTBOUND,**
Appellant,

v.

**Victoria McCLURE, Appellee.**

No. 08–05–00166–CV.

Court of Appeals of Texas,
El Paso.

Oct. 19, 2006.

Rehearing Overruled Nov. 29, 2006.

Jane M.N. Webre, Scott, Douglass & McConnico, LLP, Austin, for appellant.

John P. Mobbs, El Paso, for appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

West Telemarketing Corporation Outbound ("West") challenges the trial court's judgment entered after a jury trial awarding Appellee, Victoria McClure, damages for employment discrimination. In seven issues, West contends: (1) the evidence was legally and factually insufficient to support the jury's finding that a discriminatory purpose motivated West to terminate Appellee; (2) the evidence was legally and factually insufficient to support the jury's finding that a discriminatory purpose motivated West to deny Appellee a promotion; (3) the trial court abused its discretion in admitting evidence of stray racial remarks, allegations of unrelated instances of racial discrimination, and hearsay testimony of disparate treatment; (4) the evidence was legally and factually insufficient to support the award of compensatory damages; (5) the evidence was legally and factually insufficient to support an award for past and future lost wages; (6) there is no evidence of malice; and (7) the trial court abused its discretion in awarding attorney's fees. We affirm in part and reverse in part.

Victoria McClure is an African American who began her career with West in November of 1997. Originally, she was employed as a "marketing representative" ("MR") in the El Paso telemarketing facility of West Telemarketing Outbound Corporation. The position of MR for West primarily consisted of employees attempting to sell various products or services over the telephone for companies which had contracted with West for this service.

After working four years as an MR with West, Appellee applied for a promotion as a "team training leader" ("TTL"). After filling out the required paperwork and going through a formal interview process, Appellee was hired as a TTL in March of 2002. It is unclear from the record, but approximately two months after being hired for the TTL position, Appellee sought a promotion to a senior training leader position.

According to her testimony, Appellee sought the position after being asked by the acting site director for West, Chris Moore, if she would be interested in the job. Appellee and Chris Moore approached Buck Zengerle, a branch manager at West, inquiring about the possibility of being considered for the position. Mr. Zengerle dissuaded Appellee from applying for the position by indicating that she would not be considered for the promotion. Appellee never formally applied for the position of senior training leader after her conversation with Buck Zengerle. Another individual, Rusty Treharne, was ultimately hired for the position of senior training leader.

By the end of May, 2002, Appellee voluntarily resigned from the TTL position in order to return to her former position as an MR. Appellee resigned as a result of financial difficulties because the position of MR paid more than the TTL position due to the additional incentives. Shortly after returning to her position as an MR at West, Appellee handled a call for the "AT & T, New York Local inbound project." As a result of this call, Appellee was terminated for making a "fraudulent call." That is, logging a call as a sale when in fact the customer did not want to purchase anything.

Appellee filed suit against West alleging violations of the Texas Labor Code. *See* TEX.LAB.CODE ANN. §§ 21.051, 21.055 (Vernon 2006). A jury found that discrimination was a motivating factor in West's decision not to promote Appellee and her subsequent termination and that Appellee was entitled to recover actual and exemplary damages. The jury awarded Appellee: (1) back pay in the amount of $72,500; (2) future lost wages and employment benefits in the amount of $50,000; (3) past compensatory damages of $150,000; and (4) exemplary damages in the amount of $250,000. The trial court rendered judgment on the verdict and awarded Appellee $72,500 in back pay, $50,000 in future lost wages and benefits, and $150,000 in past compensatory damages, plus prejudgment interest in the amount of approximately $15,422. The trial court reduced the exemplary damages award to $150,000 and also awarded Appellee attorney's fees of $278,400, legal assistant costs of $2,925, and ordinary costs of $907.

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex.App.-El Paso 1999, no pet.). When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of " 'no evidence to support the finding.' " *Id.* Consequently, to address West's legal sufficiency/no-evidence challenge, we review the evidence in the light most favorable to the verdict,

disregarding all contrary evidence that a reasonable jury could have disbelieved. *City of Keller v. Wilson,* 168 S.W.3d 802, 812 (Tex.2005).

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004), *quoting Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is legally sufficient evidence. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). Put another way, if there is more than a scintilla of evidence to support the finding, then there is legally sufficient evidence. *See Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996).

In reviewing the factual sufficiency challenges to the jury's findings, we must consider all of the evidence and determine whether the evidence in support of the findings is so weak as to be clearly wrong and manifestly unjust or whether the findings are so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chemical Company v. Francis,* 46 S.W.3d 237, 242 (Tex.2001).

■ Chapter 21 of the Labor Code provides that it is unlawful for an employer to discriminate against an employee with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, national origin, or age. Tex.Lab.Code Ann. § 21.051. The Texas Legislature modeled Chapter 21 of the Texas Labor Code after federal law for the express purpose of carrying out the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments. Tex.Lab.Code Ann. at § 21.001(1); *see Soto v. El Paso Natural Gas Co.,* 942 S.W.2d 671, 677 (Tex.App.-El Paso 1997, writ denied). Consequently, when reviewing an issue under Chapter 21, we may look at cases involving the state statute as well as cases interpreting the analogous federal provisions in resolving these claims. *See Quantum Chemical Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex.2001); *Elgaghil v. Tarrant County Junior College,* 45 S.W.3d 133, 139 (Tex. App.-Fort Worth 2000, pet. denied).

■ Under Chapter 21, if a plaintiff claims that an adverse employment decision was taken against her based on race, as here, then she must establish that she: (1) is a member of a protected class; (2) suffered an adverse employment action; and (3) nonprotected class employees were not treated similarly. *Jones v. Jefferson County,* 15 S.W.3d 206, 209 (Tex.App.-Texarkana 2000, pet. denied). In a race discrimination case under the TCHRA, it is the employee's burden to prove race was "a motivating factor" in the employer's decision to terminate. *Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex. 2003).

■ When discrimination cases have not been fully tried on the merits, we apply the burden-shifting analysis established by the United States Supreme Court. *Wal–Mart Stores, Inc.,* 121 S.W.3d at 739. However, when a discrimination case has been fully tried on the merits, our inquiry does not focus on the burden-shifting analysis. *Id.* " 'We need not parse the evidence into discrete segments corresponding to a prima facie, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext.' " *Rutherford v. Harris County, Tex.,* 197 F.3d 173, 181 (5th Cir.1999). Rather, we only determine whether or not

there is sufficient evidence to support the jury's ultimate findings. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 565 (5th Cir. 2001); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 402–03 (5th Cir.2000); *Rutherford*, 197 F.3d at 180–81; *Wal–Mart Stores, Inc.*, 121 S.W.3d at 739.

### Termination

■ West's first issue attacks the legal and factual sufficiency of the evidence supporting the jury's verdict that discrimination was a motivating factor in West's decision to terminate Appellee. In this case, we need not determine if Appellee proved that race was a motivating factor in West's decision to terminate her in light of the charge actually submitted to the jury.[1] The charge which was submitted reads:

QUESTION NUMBER ONE

**Was race a motivating factor in West Telemarketing Corporation Outbound's decision to terminate Victoria McClure's employment or deny her a promotion?**

A 'motivating factor' in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

You are instructed that a plaintiff is not required to produce direct evidence of an unlawful motive. Discrimination, if it exists, is a fact which is rarely admitted, but is a fact which you may infer from the existence of other facts.

If the Plaintiff disproves the reasons offered by Defendant by a preponderance of the evidence, you may presume that the employer was motivated by race discrimination.

Although this charge may not be accurate regarding the presumption of discrimination, when we review the legal sufficiency of the evidence, our starting point is the charge which was actually submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000); *AAA Office Coffee Serv., Inc. v. Hansen*, No. 01–03–00984–CV, 2005 WL 2470666, *10 (Tex.App.-Houston [1st Dist.] Oct. 6, 2005, no pet.)(reviewing sufficiency points in light of the "motivating factor" language of the jury charge as submitted without objection rather than a "but for" standard for claim of retaliation).

We note that although West objected to question one at trial, the objection lodged argued that the charge was a comment on the weight of the evidence. West did not object that the charge was incorrect or misstated the law nor did West raise this issue on appeal.[2] At trial, counsel for West actually agreed that the charge was a correct summary of the law. During oral argument, counsel for West took the position that we should always conduct our sufficiency review according to a correct statement of the law rather than the charge as submitted to the jury when there is any objection, even if the objection is incorrect or not specific. We disagree.

In order for this Court to measure the sufficiency of the evidence against the

---

**1.** Because the charge allowed the jury to presume discrimination if Appellee disproved West's stated reason for termination, we do not reach West's third issue of whether the trial court erred in admitting circumstantial evidence of discrimination.

**2.** West did include in a "West objected to that improper instruction."

charge the trial court should have submitted, West was required to object to the instruction stating with particularity the reasons therefore. *See* Tex.R.Civ.P. 274; *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 530 (Tex.2002). In *St. Joseph Hosp.,* the appellant hospital St. Joseph specifically objected that the charge improperly defined an element of joint enterprise and tendered an instruction which tracked the language used in the Restatement of Torts. *Id.* at 525. The Court wrote that "[b]ecause the trial court submitted an erroneous definition of joint enterprise over a proper objection, we measure the legal sufficiency of the evidence supporting the jury's finding of joint enterprise against the Restatement's definition of joint enterprise...." *St. Joseph Hosp.,* 94 S.W.3d at 530.

West argues that "[t]he question is not whether West's stated reason for termination (the fraudulent call) was false, but whether McClure met her burden to prove that race was a motivating factor in the decisions." We again disagree. We think it clear that in order to measure the legal sufficiency of the evidence against the charge a court should have submitted, a party must specifically point out why the objected-to instruction or definition is incorrect. The question for our consideration, in light of the charge submitted to the jury, is whether Appellee introduced legally and factually sufficient evidence to show that West's legitimate, nondiscriminatory reason for her termination was false. This is because the charge allowed the jury to presume the employer was motivated by discrimination if Appellee disproved West's stated reason for her termination.

During the trial on the merits, Appellee testified that on June 14, 2002, she was told by William Moreno, the production manager, to report to Wesley Neitzel's office. When Appellee did so, she was given the "Call Quality Performance Report (Verification)" and the "Performance Improvement Notice" indicating that she would be terminated. Ms. McClure testified that she responded that she did not "believe I made a fraudulent sale." Appellee testified that during the conversation, Wesley Neitzel stated that he had "been holding on to [the notice] because I needed to talk to Buck. I didn't think you made a fraudulent sale either." Appellee stated that Mr. Neitzel told her that "he listened to the tape" and "told [her] to go to Margie Marquez' office." Appellee testified that while in Mr. Neitzel's office, William Moreno made the statement that "I don't know why they came up with this shit in trying to fire you." Appellee stated that rather than sign the CQ report or the Performance Improvement Notice, as is West's policy, William Moreno "walked out with [her]."

Appellee also testified that the attorney for West indicated that she had "slammed" a customer. According to Appellee, "slamming" a customer consists of calling customers who subscribe to other phone service providers and switching them without their permission. Appellee testified that it would be impossible to "slam" a customer on a new install, because they were calling to create a new telephone number. Appellee also stated that based on her experience and knowledge of West's policy, West determines a fraudulent sale from the West computer system, not from a recording of the call.

Appellee testified that she cancelled the order on the West LOS system. Further, Appellee stated that in the West RCAM system, she noted that the order had been cancelled. She also stated that she had placed the notes in the RCAM system on June 5, 2002, the day of the sale. Appellee also testified that she did not know what

happened to the notes that she placed in the system on June 5, 2002, but guessed that "somebody deleted it."

What is most telling are the events following the termination. Appellee appealed the termination decision to Margie Marquez pursuant to West policy. At some point during the process, Margie Marquez received an e-mail from William Moreno, Production Manager, on Thursday, June 20, 2002, stating:

> Margie:
>
> I went through LOS and RCAM and found some information that might be helpful to you. *LOS had the order canceled* but RCAM had notes on the 14 of June stating that the customer wanted to cancel the order but the btn was not able to be canceled. I also looked up other dates and there were no notes. The id used to make notes on June 14 was S8IMFHM this RCAM ID belongs to Victoria McClure. There were no notes on June 5, which is the day of the sale. If you have any questions please call me at 0325. [Emphasis added].

Ms. McClure testified that she was terminated on June 14, 2002. She also testified that she appealed the process. After two days, she called Margie Marquez to determine the status of her appeal. Ms. McClure stated that Ms. Marquez informed her that she would make her decision in six days. Ms. McClure testified that Ms. Marquez called her at the end of the sixth day, informed her "the decision stands," and hung up the phone. Even after receiving the e-mail, which apparently indicated that Appellee did not make a fraudulent call, Ms. Marquez decided not to reverse the decision to terminate Appellee. In fact, the employee relations training coordinator who replaced Ms. Marquez testified that she could not explain why Ms. McClure would still be fired when the information from the computer system showed that the order had in fact been cancelled.

■ Ultimately, the evidence in this case consisted primarily of witness testimony. The jury heard conflicting testimony on all of the material issues at trial. Although West presented contradictory witness testimony to rebut almost every significant aspect of Ms. McClure's testimony, it was the jury's responsibility to determine the credibility of the witnesses and to choose which portions of testimony to believe or disbelieve, and ultimately to weigh all of the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We have no authority to re-evaluate the witnesses' credibility or substitute our judgment for that of the jury. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998). This is true even when the evidence would clearly support a different result. *Id.; see also Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 271 (Tex.App.-Fort Worth 2004, no pet.)(because the evidence was a "swearing match" between the parties, the court would not reevaluate the weight and credibility of the evidence and would defer to the trial court's role as the exclusive judge of the credibility of the witnesses); *see also Davis v. Fisk Elec. Co.*, 187 S.W.3d 570, 580 (Tex.App.-Houston [14th Dist.] 2006, pet. filed)(concluding it was jury's role to determine version of facts to believe after hearing substantial and conflicting evidence on every relevant fact in discrimination case).

After viewing the evidence in the light most favorable to the verdict, we find that there was legally sufficient evidence to support a finding by the jury that the legitimate, nondiscriminatory reason proffered by West was false. Concerning the factual sufficiency, we conclude the evidence presented was not so contrary to the

overwhelming weight of the evidence as to be clearly wrong or unjust. Accordingly, we hold that the evidence was both legally and factually sufficient to support a jury's affirmative answer to question one.[3] Issue One is overruled.

### Award of Back Pay and Future Lost Wages

■ In Issue Five, West challenges the legal and factual sufficiency of the evidence supporting the award of back pay and future lost wages. As it relates to the award of back pay, the trial court has discretion to award back pay as equitable relief in a race discrimination lawsuit. TEX.LAB.CODE ANN. § 21.258(b)(1). The correct measure of damages for lost wages is the amount of money the employee would have earned had she not been terminated, less the sum she did earn after termination. TEX.LAB.CODE ANN. § 21.258(c); *Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores*, 951 S.W.2d 542, 547 (Tex.App.-El Paso 1997, no writ). In awarding back pay, the court must also deduct any workers' compensation benefits and unemployment compensation benefits. TEX.LAB.CODE ANN. § 21.258(c).

West directs our attention to *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex.App.-Austin 1993, writ denied), for the proposition that a jury cannot "arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial." In *Keilman*, a bank charged unauthorized interest, the parties presented competing calculations; the bank contended that it had charged $169.92 in authorized interest, and the plaintiff contended that the bank had charged $7,161.44 in unauthorized interest.

*Keilman*, 851 S.W.2d at 930. The jury found that the bank had charged $360 in unauthorized interest. Although the amount awarded by the jury was within the range between the different interest figures presented by the parties, the evidence was factually insufficient to support the award because there was inadequate support for a theory that would have resulted in the figure returned by the jury. The evidence supported a choice of one figure or the other, not somewhere in the range between them. *Id.* at 931.

■ On the other hand, where there is proof to support a range of damage options, the mere fact that nothing in the record shows how the jury arrived at a specific amount is not fatal to the verdict. *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex.App.-Austin 1997, writ denied). In *Mayberry*, the Court concluded that some evidence supported a jury verdict for back pay because the theory of the case provided for a range of possible damage awards (rather than only a choice between two amounts) depending on when the jury concluded the plaintiff should have been promoted, and because the verdict was within the narrow range defined by competing extremes posited by the parties. *Id.* (award of $1206 fell between $1028 and $1292).

In the instant case, Appellee testified that prior to her termination, she resigned from the position of TTL to return to her former position as an MR. Appellee stated that she did this because MR's make more money than TTL's because of incentives and overtime. Evidence of Appellee's weekly earnings while employed as an MR in 2002 were introduced. While the amount earned for each individual pay pe-

---

**3.** Because the judgment can be supported by the discrimination finding, we need not address the promotion claim in Issue Two.

riod varied, there was some evidence indicating that her gross weekly earnings could reach as high as $1,168 depending upon the number of regular hours that she worked, number of overtime hours worked, incentives, premiums, and tenure pay. The jury also heard testimony that West provided insurance benefits to employees who worked over thirty hours a week.

Appellee was terminated on June 14, 2002, and the matter went to trial on November 8, 2004, a period of approximately 29 months (128 weeks).[4] In terms of interim earnings, evidence was introduced that Appellee earned approximately $8,415 in unemployment benefits and approximately $12,360 in wages for a total of approximately $20,775. No evidence was introduced as to the value of any other benefits such as insurance.

■ The jury could have based lost earnings on Appellee's highest weekly earnings statement. This would result in a figure as high as approximately $149,504 ($1,168 × 128 weeks). Subtracting the interim benefits from this figure results in a range from $0 to as high as $128,729 without calculation of any other benefits. The jury awarded $72,500 for back pay. The jury has discretion to award damages as long as the damage award is within the range of evidence presented at trial and a rational basis exists for its calculation. *See Mayberry*, 948 S.W.2d at 317. Unlike *Keilman*, the evidence of Appellee's lost wages did not support an either/or amount. The jury could have averaged her last six months of weekly pay stubs, used either the highest or lowest pay stub to calculate potential earnings, or used one or the other or an average of the previous two years of earnings. The different ways in which the jury could have calculated Appellee's

lost earnings distinguish this case from the facts in *Keilman*. We find the evidence both legally and factually sufficient to support the award of back pay.

■ In regards to the award of front pay, front pay is an equitable remedy intended to make a person whole after suffering employment discrimination when reinstatement is not a feasible option. *Wal–Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 45 (Tex.App.-Austin 1998, pet. denied). Front pay is awarded to compensate the plaintiff for future lost wages and benefits. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 n. 27 (5th Cir.2001). Reinstatement is generally preferable to an award of front pay, however, a court may award front pay in lieu of reinstatement especially when reinstatement is not a feasible option. *See Hansard v. Pepsi–Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1470 (5th Cir.1989). In its findings of fact and conclusions of law, the trial court entered the following findings of fact:

> The question of the amount of the Plaintiff's front pay was submitted to the jury by agreement of the parties.

> The Plaintiff requested reinstatement, but Defendant opposed reinstatement of the Plaintiff.

> Based on the Defendant's opposition to reinstatement of the Plaintiff, the Court finds that reinstatement of the Plaintiff is not feasible.

> The amount of $50,000 would fairly, reasonably and equitably compensate the Plaintiff for her front pay losses.

Appellee testified that she had intended to continue working for West until her retirement around the year 2036 had she not been fired. The jury was entitled to

---

**4.** West indicates in its brief that the period between termination and trial included only eighteen months.

believe her. The record establishes that Appellee could have earned between approximately $20,000 to $50,000 a year at the time of her termination depending upon number of hours worked, overtime, bonuses, and incentives. Her year 2000 W–2 indicated that she earned approximately $20,000 in wages, tips, and other compensation. Her year 2001 W–2 indicated that she earned approximately $17,000. Additionally, the highest amount Appellee earned during the last six months of employment with West for a pay period of one week was approximately $1,168. We find that there is some evidence supporting the jury's award of damages. Further, in light of the entire record, the jury's finding is not clearly wrong and unjust. Accordingly, there is both legally and factually sufficient evidence to support the award of damages for front pay. Issue Five is overruled in its entirety.

### Compensatory Damages

In Issue Four, West argues that the "award of compensatory damages is not supported by the evidence." Jury question number three asked "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate Victoria McClure for her damages, if any, that resulted from such conduct?" In the instructions accompanying this question, the term "Compensatory damages" was defined to include "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages." The charge also defined "Mental anguish." The jury was then asked to award a specific amount of damages for "Compensatory damages in the past." Specifically, West focuses on the mental anguish component of the award.

In addressing mental anguish, we are guided by the Texas Supreme Court's decision in *Saenz v. Fidelity & Guar. Ins.*

*Underwriters,* 925 S.W.2d 607 (Tex.1996). In *Saenz,* the Court reaffirmed *Parkway Co. v. Woodruff,* 901 S.W.2d 434 (Tex. 1995), and found that mental anguish damages could not be awarded without either " 'direct evidence of the nature, duration, or severity of [plaintiff's] anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or other evidence of a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Saenz,* 925 S.W.2d at 614, *citing Parkway,* 901 S.W.2d at 444; *see also Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 85–6 (Tex.App.-El Paso 1992, no writ). Additionally, there must be some evidence to justify the amount actually awarded. *Saenz,* 925 S.W.2d at 614. While the court did acknowledge that juries should be given some measure of discretion in finding damages, it made clear that a jury's discretion was not unlimited. *See id.*

In *Saenz,* the only testimony regarding mental anguish was Saenz's testimony that she "worried . . . a lot" about her loss of income and her inability to pay future medical bills. *See Saenz,* 925 S.W.2d at 614. Unlike *Saenz,* in this case there is ample evidence of mental anguish. Ms. McClure testified that when she was escorted out of the West facility by security guards, she felt "disgusted and humiliated." She stated that "everybody was whispering. Everybody was talking . . . . It was very humiliating to me. It crushed me, actually." She stated that after she received notice that the termination decision would stand from Ms. Marquez, "she cried . . . . Because [she] had put a lot into that job."

She testified that the loss of her job led to her inability to support her family and she felt like she had failed her children. She also stated that she became "depressed" and she did not accept calls from

her co-workers and did not allow visitors to her home. She testified that her depression lasted "for a while, because [she] went out looking for a job. And it was more difficult than [she] thought." She stated that it took some time for her unemployment hearing and she was behind on her bills and was going to lose her home. When asked how long she was depressed, Ms. McClure stated that she was "still depressed over this situation" which, by the time of trial, was over two years after the termination.

Ms. McClure also testified that she had to "pawn" personal items including her son's necklace given to him by his deceased father in order to "try to make it through." She stated that she had never seen a psychiatrist or psychologist about her feelings of sadness or depression or taken any medication but that she would cry and lay in her bed. During trial, the following exchange regarding an earlier deposition took place between counsel for West and Ms. McClure:

Q: This is page 89 of your deposition, and this is where you and I discussed those issues. Now, starting at line 3, do you see where I asked you: What do you mean when you say it hurts?

And then you answered: You're not able to perform or function. I don't—

Oh, well, skip that.

Line 7: What do you mean when you say you're not able to perform or function?

And then your answer was what?

A: That I don't like where I'm working.

Q: No, I'm sorry, ma'am. I skipped down to the next question.

A: Where are you?

Q: Starting on line 7. Can you see that? Do you see where I am, ma'am?

A: Yes. It says: When you can't pay your bills and provide for your family and your kids, and you don't know where the money is going to come from the next day, your body breaks down.

Q: Okay. That's what you and I were just talking about before, right?

A: That's correct.

Q: Now—and I asked you then: Have you experienced that?

And do you see what your answer is?

A: Yes.

Q: Line 13, it says: Yes.

And I say: What do you mean your body breaks down?

And your answer is what?

A: When I—where I just lay in bed and cry and can't move.

Q: And I asked you: When was the last time that happened to you?

A: And I said: About a month ago.

Q: Then I asked you: How many times has that happened to you?

A: And I said: A lot.

Q: Okay. And I asked you: What do you mean by a lot?

And what did you say?

A: I started telling you that I got a statement, basically being behind on my bankruptcy payment, and trying to catch up with my house note, and my son was graduating.

Q: Okay. And then I asked you: How many times has this happened to you, that you've laid in bed and couldn't move?

A: Where are you reading that, again?

Q: I asked the last line on page 89, which is: Okay. How many times has this happened to you, that you've laid in bed and couldn't move?

Do you see that question?

A: And I said: At least 13 times, just stressed out.

In reviewing only the evidence and inferences that tend to support the jury's findings, this Court concludes that there was more than a scintilla of evidence for the jury to conclude that Ms. McClure suffered compensable mental anguish or other nonpecuniary losses. There was evidence of the nature and severity of her mental anguish, including testimony that Ms. McClure felt "humiliated," "crushed," "depressed," and that "[her] body breaks down." Additionally, there was evidence that at times Ms. McClure was confined to her bed "and couldn't move" which would certainly interrupt her daily routine and render her unable to deal with everyday activities.

Regarding the factual sufficiency of the evidence, this Court has stated that for there to be factually insufficient evidence of mental anguish, there should be "evidence contrary to the jury's finding, not just weak evidence supporting it." *America West Airlines, Inc. v. Tope*, 935 S.W.2d 908, 916 (Tex.App.-El Paso 1996, writ dism'd as moot). Although West did challenge portions of Ms. McClure's testimony on cross-examination, there was no evidence presented which directly contradicted her testimony on the nature and severity of her mental anguish. Therefore, we find that the evidence supporting the award of compensatory damages was not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust.

Additionally, West challenges the evidence supporting the amount awarded as compensatory damages. After hearing the evidence, the jury awarded Ms. McClure $150,000 for "Compensatory damages in the past." We note that Ms. McClure testified that her depression continued after the termination and up until the time of trial, some two years later. After a review of the evidence presented and considering the duration of Ms. McClure's depression, we find that the evidence in this case was sufficient to support the amount awarded as compensatory damages and that the award is "fair and reasonable." *See Saenz*, 925 S.W.2d at 614. Consequently, Issue Four is overruled.

### Exemplary Damages Award

■ In Issue Six, West challenges the sufficiency of the evidence to support the award of punitive damages based on a finding of malice. Appellee responds that "because Appellant does not challenge the finding of reckless indifference, its challenge to the malice finding provides no basis for reversal." We disagree. We begin our analysis with the charge submitted to the jury. *Osterberg*, 12 S.W.3d at 55. Here, the jury charge defined "malice" as:

(a) a specific intent by West Telemarketing Corporation Outbound to cause substantial injury to Victoria McClure; or

(b) an act or omission by West Telemarketing Corporation Outbound,

 (i) which, when viewed objectively from the standpoint of West Telemarketing Corporation Outbound at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

 (ii) of which West Telemarketing Corporation Outbound had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

By statute, exemplary damages may only be awarded when there is a finding of malice, fraud, or gross negligence. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 41.003(a)(Vernon Supp.2006). The Texas Labor Code allows recovery for punitive damages when the "respondent engage[s] in a discriminatory practice with malice or with reckless indifference to the state-protected rights of an aggrieved individual." *See* TEX.LAB.CODE ANN. § 21.2585(b).

■■■ Rather than suggesting alternate grounds of recovery as Appellee argues, this portion of the statute refers to the subjective knowledge of the employer that its actions are in violation of the law. *Shear Cuts, Inc.*, 141 S.W.3d at 272. Before imposition of punitive damages is warranted, an employer must have acted either with malice (specific intent to harm), or with reckless indifference to state-protected rights. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 119 S.Ct. 2118, 2124, 144 L.Ed.2d 494 (1999)(interpreting an analogous provision in the context of Title VII).

By the charge submitted to the jury, "malice" could have been predicated on a finding that West had acted with either the specific intent to harm, or that its actions were grossly negligent. *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., *Texas Pattern Jury Charges: Business, Consumer, Insurance, & Employment* PJC 110.31A (2003). West challenged the finding of "malice." In the charge, as submitted, both "malice" and "gross negligence" are defined as simply "malice." The challenge to the finding of "malice" includes both grounds and West has waived neither. Accordingly, we will consider whether there is legally sufficient evidence of "malice" as that term is defined in the charge. *Osterberg*, 12 S.W.3d at 55; *Ancira Enterprises, Inc. v. Fischer*,

178 S.W.3d 82, 93 (Tex.App.-Austin 2005, no pet.).

The standard for recovery of exemplary damages is by clear and convincing evidence. TEX.CIV.PRAC. & REM.CODE ANN. § 41.003. When we review the sufficiency of the evidence of a finding that must be proven by clear and convincing evidence, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Southwestern Bell Telephone Co. v. Garza*, 164 S.W.3d 607, 619 (Tex.2004).

■■■ An award of punitive damages must be supported by more than mere knowledge on the part of the employer that its acts are discriminatory. *Ancira Enterprises, Inc.*, 178 S.W.3d at 94, *citing Kolstad*, 527 U.S. at 535, 119 S.Ct. at 2124; *see also Shear Cuts, Inc.*, 141 S.W.3d at 272; *Shoreline, Inc. v. Hisel*, 115 S.W.3d 21, 26 (Tex.App.-Corpus Christi 2003, pet. denied). To recover punitive damages, Ms. McClure was required to introduce clear and convincing evidence that West was aware that its actions were in violation of the law. *Ancira Enterprises, Inc.*, 178 S.W.3d at 94. Consequently, even if the individuals responsible for terminating Ms. McClure had engaged in intentional discrimination, this would not support an award of punitive damages unless those actors were aware that their actions were in violation of the law. *Ancira Enterprises, Inc.*, 178 S.W.3d at 94. Therefore, under the jury charge in this case, the punitive damages award must be supported by clear and convincing evidence that West managerial employees knew that their conduct was illegal and: (1) terminated Appellee with the intent to cause her injury; or (2) were grossly negligent in doing so. Appellee can prove West's knowledge by either direct or circumstan-

tial evidence. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994).

Here, Appellee has failed to introduce clear and convincing evidence that West not only intended to discriminate against her, but also *knew* that such discrimination was in violation of the law. There was testimony concerning the policy of West regarding discriminatory practices. However, the individual who testified about the West policy was not employed by West at the time the alleged discrimination occurred. There was no evidence that the managerial employees of West responsible for the termination of Ms. McClure possessed the requisite knowledge, training, or experience in employment related issues to know that their actions were in violation of any applicable law. Ms. McClure introduced no evidence that the individuals responsible for her termination had attended any specialized training, were familiar with any specific policy of West, or otherwise could be charged with knowledge that their actions were unlawful. We are not convinced that a reasonable trier of fact could have formed a firm belief or conviction that West knew that terminating Ms. McClure would violate the law. Therefore, we sustain West's Issue Six. Accordingly, we reverse and render that Ms. McClure take-nothing as to the award of exemplary damages.

### Attorney's Fees

 In Issue Seven, West argues the affidavit by trial counsel Enrique Chavez, Jr., submitted as evidence of attorney's fees, should not have been considered by the trial court because his opinions were not disclosed in a response to requests for disclosure. Additionally, West is arguing that the trial court erred in awarding attorney's fees because the amount was not warranted under the facts of this case. West first objected to the affidavit of Mr.

Chavez by written motion on grounds that Ms. McClure had failed to supplement disclosure. The trial court denied West's objection to the attorney's fees testimony. West re-urged its objection to the affidavit for failure to supplement in a motion for new trial. In the motion for new trial, West also pointed out that it had objected to the attorney's fees in its earlier filed "Objection to Attorney's Fees Testimony and Response to Plaintiff's Application for Attorney's Fees." The trial court subsequently denied the motion on April 12, 2005.

 We review a trial court's decision relating to discovery matters for an abuse of discretion. *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 855 (Tex.App.-Fort Worth 2001, pet. denied). Whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Ramirez v. Ramirez*, 873 S.W.2d 735, 738 (Tex.App.-El Paso 1994, no writ).

 When a party fails to supplement a discovery response in a timely manner, the evidence may be excluded. TEX.R.CIV.P. 193.6(a); *see also Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 914 (Tex.1992). The remedy is mandatory and automatic unless the court finds there was good cause for the failure to amend or supplement, or the failure will not unfairly surprise or prejudice the other party. TEX.R.CIV.P. 193.6(a). The burden of establishing good cause or lack of unfair surprise is on the party seeking to introduce the evidence. TEX.R.CIV.P. 193.6(b). The trial court has discretion to determine whether the offering party has met its burden of showing good cause. The record must support a finding of good cause

or lack of unfair surprise. Tex.R.Civ.P. 193.6(b). This Court will uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).

The request for disclosure at issue specifically asks for the following information:

(f) for any testifying expert or a consulting exert [sic] whose mental impressions or opinions have been reviewed by a testifying expert:

 (1) the expert's name, address and telephone number;

 (2) the subject matter on which the expert will testify;

 (3) the general substance of the expert's mental impressions an [sic] opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

 (4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party;

 (A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, prepared by or for the experts in anticipation of the expert's testimony; and

 (B) the expert's current resume and bibliography.

Rule 194.2(f) allows a party to request disclosure of the general substance of the experts mental impressions and opinions and a brief summary of the basis for them as required by the rules of civil procedure. Tex.R.Civ.P. 194.2(f). A party is under a continuing duty to amend or supplement the response when they learn that a response is no longer "complete and correct." Tex.R.Civ.P. 193.5(a).

In this case, counsel for Ms. McClure included the name, position, address, and phone number of all attorneys who might testify as experts "to their education, experience and training and as to the reasonableness and necessity of attorneys [sic] fees in this case" in its response. Counsel for Ms. McClure argues that West can not claim any unfair surprise from the failure to supplement the responses to the request for disclosure. First, Ms. McClure points out that the original petition includes a request for attorney's fees and thus, West knew from receipt of the original petition that attorney's fees would be in issue. Additionally, Ms. McClure points out that even if the responses were inadequate, West was on notice more that a year before trial that her attorney would testify as an expert to reasonable and necessary fees. We agree with Ms. McClure.

The record before us supports a finding that West was aware that the attorney for Ms. McClure would testify as to attorney's fees. Further, we are confident that the failure to supplement would not result in any unfair surprise to West. Implicit in the ruling of the trial court to consider the affidavit of Ms. McClure and deny the motion to exclude of West is a finding of either good cause, lack of unfair surprise, or undue prejudice. *See e.g., Capital Metro. Transp. Author./Cent. of Tenn. Ry. and Navigation Co., Inc. v. Cent. of Tenn. Ry. and Navigation Co., Inc.*, 114 S.W.3d 573, 583 (Tex.App.-Austin 2003, pet. denied); *Bellino v. Commission for Lawyer Discipline*, 124 S.W.3d 380, 384 (Tex.App.-Dallas 2003, pet. denied); *Parker Plaza West, Ltd. v. Boniuk Investments, Ltd.*, 153 S.W.3d 729, 734 (Tex.App.-Dallas 2005, no pet). Based on the record before us, we conclude that the trial court did not abuse its discretion in impliedly finding that West was not unfairly surprised by Ms. McClure's failure to disclose this additional

information. Accordingly, there was no error in the trial court's decision to admit the affidavit.

 Having found no error in the admission of the affidavit of Ms. McClure's trial counsel, we next review the award of attorney's fees. The only evidence that was introduced by Ms. McClure on the issue of attorney's fees was the affidavit of trial counsel, Enrique Chavez, Jr. West argues that the evidence is insufficient because Ms. McClure did not submit to the trial court sufficiently detailed records documenting the work performed and the hours expended.[5] We disagree.

 The amount of a fee award rests in the sound discretion of the trial court, and we will not reverse the trial court's judgment on appeal absent a clear abuse of discretion. *Cordova v. Southwestern Bell Yellow Pages, Inc.*, 148 S.W.3d 441, 445–46 (Tex.App.-El Paso 2004, no pet.). Even though the appropriate standard of review is abuse of discretion, we may review an award for sufficiency of the evidence. *Id.* at 446. This hybrid analysis requires a two-pronged inquiry. Did the trial court have sufficient information upon which to exercise discretion and, if so, did the trial court err in the application of its discretion? *Id.* The traditional sufficiency review comes into play with regard to the first question; however, our inquiry cannot stop there. Id. We must proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Cordova*, 148 S.W.3d at 446. Stated inversely, we must conclude that the trial court's decision was neither arbitrary nor unreasonable. *Id.*

 Under the TCHRA, a trial court may allow the prevailing party reasonable attorney's fees as part of costs. Tex.Lab. Code Ann. § 21.259(a). In this case, the trial court used the "lodestar" method to determine a reasonable fee. Under this method, the court determines the hours reasonably spent on the matter and multiplies those hours by an hourly rate. *Dillard Department Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 412 (Tex.App.-El Paso 2002, pet. denied). The trial court then adjusts the "lodestar" figure by the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *Gonzales*, 72 S.W.3d at 412. The *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required; (4) the effect on other employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the attorney's relationship with the client; and (12) awards in similar cases. *Gonzales*, 72 S.W.3d at 412, *citing Johnson*, 488 F.2d at 717–19. If some of these factors are accounted for in the lodestar amount, they should not be considered when making adjustments. *Gonzales*, 72 S.W.3d at 412.

In the affidavit submitted to the court, counsel for Ms. McClure presented evidence on each of the *Johnson* factors. As

---

5. In a brief paragraph, West also argues that the trial court should have further explained and articulated how each of the *Johnson* factors were applied. In response to a request for findings of fact and conclusions of law, the trial court found that the "attorney fees and costs stated in the Court's revised judgment are reasonable and necessary attorney fees and costs...." West did not request any additional or amended findings and this point is therefore waived. *See Heritage Resources, Inc. v. Hill*, 104 S.W.3d 612, 620 (Tex.App.-El Paso 2003, no pet.).

one of the designated experts on attorney's fees, trial counsel stated that he had represented Ms. McClure in this matter for over two and one-half years. He indicated that $200 is within the range of fees "customarily charged in El Paso County for similar legal services, for lawyers with similar legal experience." Counsel stated that he had spent 575 total hours in his representation of Ms. McClure and that his co-counsel had spent 76 hours. Counsel further indicated that in his opinion, "the time devoted was necessary to the successful result obtained and it was reasonable, given the facts, circumstances and demands of the case." Counsel also testified that he performed all of the work for this case himself and did not seek the assistance of co-counsel until he was required to do so in preparing for the actual trial. Counsel included a list of pleadings and various discovery mechanisms which he was required to either review, draft, or participate in such as, drafting pleadings, respond to requests for production, requests for disclosure, and interrogatories, as well as take part in depositions.

Additionally, counsel stated that he was a solo practitioner and that by accepting this case, he was precluded from taking other clients. Counsel indicated that he had accepted this case on a contingency basis and that he had obtained an "excellent" result in the matter. Counsel included significant detail about his experience in employment law and information concerning his reputation and ability. Counsel similarly provided detail about his co-counsel. Finally, counsel included statements about the undesirability of the case, the relatively few qualified attorneys in the area who could handle similar cases, and awards in similar cases.

Generally, a court does not abuse its discretion simply because the evidence presented on attorney's fees is not provid-ed in the form of billing records or other similar evidence. *See Air Routing Int'l Corp. (Canada) v. Britannia Airways, Ltd.,* 150 S.W.3d 682, 692 (Tex.App.-Houston [14th Dist.] 2004, no pet.), *citing Holmes v. Concord Homes, Ltd.,* 115 S.W.3d 310, 316–17 (Tex.App.-Texarkana 2003, no pet.); *Schlager v. Clements,* 939 S.W.2d 183, 191–93 (Tex.App.-Houston [14th Dist.] 1996, writ denied). In light of the affidavit testimony presented by the trial counsel of Ms. McClure as to each of the *Johnson* factors, we find that the trial court had sufficient information upon which to determine attorney's fees in the amount of $278,400 was reasonable. We therefore conclude that the trial court did not abuse its discretion in making its finding. Issue Seven is overruled.

Accordingly, we affirm that part of the judgment in which Ms. McClure prevailed on her claim for employment discrimination under the TCHRA including: (1) the attorney's fee award; (2) the past lost wages award; (3) the future lost wages award; and (4) the award for past compensatory damages. We reverse and render Ms. McClure take-nothing in that part of the judgment awarding exemplary damages.

BARAJAS, C.J. (Not Participating).